## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AVMED, INC.**                                              )
4300 NW 89 Boulevard                                         )
Gainesville, FL 32606,                                       )
                                                            )
**PROMINENCE HEALTHFIRST**                                   )
1510 Meadow Wood Lane                                        )
Reno, NV 89502,                                              )
                                                            )
and                                                          )
                                                            )
**PROMINENCE HEALTHFIRST of TEXAS, INC.** )
1510 Meadow Wood Lane                                        )
Reno, NV 89502,                                              )
                                                            )
        Plaintiffs,  )
                                                            )
      v.                       )          Case No. _____
                                                            )
**ALEX M. AZAR II**, in his official capacity                )
as Secretary of Health and Human Services,                   )
U.S. Department of Health & Human Services                   )
200 Independence Avenue SW                                    )
Washington, DC 20201,                                        )
                                                            )
      and                      )
                                                            )
**SEEMA VERMA**, in her official capacity as                 )
Administrator,                                               )
Centers for Medicare & Medicaid Services                     )
7500 Security Boulevard                                      )
Baltimore, MD 21244,                                         )
                                                            )
      Defendants.              )
                                                            )

## **COMPLAINT**

Plaintiffs AvMed, Inc. ("AvMed"), Prominence HealthFirst and Prominence HealthFirst

of Texas, Inc. ("Prominence," and collectively with AvMed, "Plaintiffs"), by and through their

undersigned counsel, hereby submit their complaint for declaratory relief against defendants

1

Alex M. Azar II, in his official capacity as Secretary of Health and Human Services and Seema Verma, in her official capacity as Administrator of the Centers for Medicare & Medicaid Services ("CMS") for arbitrary and capricious changes to the Star Rating system for Medicare Advantage and Part D health plan contracts, made without adherence to required procedure, and in violation of the Administrative Procedure Act, and in support of their complaint, state as follows:

## PRELIMINARY STATEMENT

1.     The Star Rating system is a critical mechanism by which the federal government ranks the quality of Medicare Advantage organizations. Each year CMS, the federal organization that oversees Medicare, studies and surveys Organizations' quality and assigns a numerical rating on a five-star scale. That rating has far-reaching consequences, determining the amount of funds CMS will pay to each Organization, and influencing beneficiaries' choices in enrollment by distinguishing the highest-quality plans from the rest. The Star Ratings are designed to be "a true reflection of the plan's quality," and based on data that is "complete, accurate, reliable, and valid." (83 Fed. Reg. 16440, 16512 (April 16, 2018).)

2.     The Star Ratings create monetary incentives to encourage Medicare Advantage Organizations to make investments in service and quality programs to better serve Medicare beneficiaries.  Reflecting this importance, Congress requires that changes to the Star Ratings data collection comply with rigorous statutory procedures. Organizations rely on CMS's instructions about the manner that their Star Rating is calculated, ordinarily issued years in advance, to guide their expenditures and program improvement efforts.  For this reason, any surprise changes to the manner in which Star Ratings are calculated can have a significant adverse impact on the Medicare Advantage Organizations and their beneficiaries, undermining the very purpose of the

Star Rating program.  CMS has historically designed the program so as to treat each Organization "fairly and equally," judging them only on matters that are "under the control of the health or drug plan," in a system that will "minimize unintended consequences" adopted through a "Process of developing [ratings methodology that] is transparent and allows for multi-stakeholder input." (Id.)

3.    Ignoring these considerations, CMS, at the last minute, unlawfully changed the rules by which it scores the performance of private health insurers that provide health coverage to 22 million Medicare beneficiaries.  (*Federal Register* in April 2020, at 85 Fed. Reg. 19290 (the "Interim Final Rule")).  In April of this year, in response to the COVID-19 pandemic, CMS made dramatic changes to the Star Ratings program, essentially halting the data submission processes underlying nearly half the inputs into the ratings, without first seeking comment.  In doing so, CMS failed to follow an explicit mandate from Congress that it could not change the types of data required to be submitted by Medicare Advantage Organizations without first consulting with Medicare Advantage Organizations and accrediting bodies, and reporting on the change to Congress. To account for the change in data, it arbitrarily adopted a *post hoc* revision to the Star Ratings program, opting to use old, recycled data for half the inputs for the 2021 Star Ratings, with the remainder using updated data. Still worse, CMS is inexplicably giving *extra* weight to some of the old data, and collecting and using data from other sources during the pandemic itself.

4.    At a time when those insurers and Medicare beneficiaries can least afford it, the procedurally deficient and arbitrary changes made by the defendants to the Star Rating calculations will cause Plaintiffs and other insurers to have unexpectedly lower 2021 quality ratings that they would not have had absent the rule changes.  The decline in ratings caused by

the new rule will require that some Organizations consider charging higher premiums than their competitors, or scaling back benefits, which in competitive markets will dramatically impact the distribution of Medicare beneficiaries.

5.     This dramatic shift in the competitive landscape of Medicare Advantage Organizations, which impacts some of the largest and smallest Organizations in the country and their beneficiaries, is the result of unlawful agency action. In short, CMS created an arbitrary and capricious rule that also failed to adhere to the statutorily required procedure of consulting with Organizations and accrediting organizations and notifying Congress prior to changing the type of data used in the Star Ratings.

6.     The fact that CMS's change in the Star Rating calculation methodology for 2021 was done in response to the COVD-19 pandemic does not change the analysis.  Indeed, CMS had just last year adopted rules on how Star Ratings would be handled in the event of a disaster, making clear that that the overarching policy in the event of disaster situations is to hold Medicare Advantage Organizations harmless from disaster related declines to their Star Ratings and that no Organization would be punished in the Star Rating system as a result of a disaster. Despite this promise, CMS arbitrarily created a hybrid system, relying inconsistently on old and new data and even magnifying the weight of some years-old information. We are left now with what CMS claimed it wanted to avoid – prejudicing Medicare Advantage Organizations because of a disaster.

7.     The changes implemented by CMS have left the 2021 Star Ratings methodologically unsound, relying on stale data, and needlessly punishing organizations like AvMed and Prominence, whom CMS had in the past promised to protect, that made investments in quality improvement based on CMS's pre-existing, formally promulgated methodology for

2021 Star Ratings. For AvMed, the net effect of these changes has been a reduction in its overall rating from 4 stars (for 2020) to 3.5 stars (for 2021). For Prominence HealthFirst, the net effect of these changes has been a reduction in its overall rating from 3.5 stars (for 2020) to 3 stars (for 2021). For Prominence HealthFirst of Texas, the net effect of these change resulted in the plan remaining at 2.5 stars, instead of the 3.0 stars it would have had absent the changes in the Star Ratings calculations.

8.     AvMed and Prominence seek to have the changes to the 2021 Star Ratings program in the Interim Final Rule vacated, so that CMS, Medicare Advantage Organizations and the public can together reexamine the 2021 Star Ratings, and develop a rational scoring system that complies with the law, adheres to the CMS "hold harmless" principle, and accurately informs the public about plan performance, and recognizes the hard-earned quality improvements of Medicare Advantage Organizations like AvMed and Prominence.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331. This action arises under the Medicare Act, 42 U.S.C. § 1395 et seq.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

10.     Venue is proper under 28 U.S.C. § 1391(e).

## PARTIES

11.     Plaintiff AvMed is a corporation organized under the laws of the State of Florida with its principal place of business in Gainesville, Florida. AvMed is one of Florida's oldest and largest not-for-profit health plans, operating in the state for over 50 years. Among other things, AvMed provides health insurance coverage under Medicare Part C, commonly known as Medicare Advantage, and prescription drug coverage under the Medicare voluntary prescription

drug benefit, commonly known as Medicare Part D. AvMed offers its plans under contract number H1016 to more than 24,000 Medicare-eligible beneficiaries in Broward and Miami-Dade Counties in Florida.

12.     Plaintiff Prominence HealthFirst is a corporation organized under the laws of the State of Nevada with its principal place of business in Reno, Nevada. Prominence HealthFirst is a small, regional health plan formerly known as Saint Mary's Health Plan. Among other things, Prominence HealthFirst provides health insurance coverage under Medicare Part C, commonly known as Medicare Advantage, and prescription drug coverage under the Medicare voluntary prescription drug benefit, commonly known as Medicare Part D. Prominence offers its plans under contract number H5945 to more than 11,800 Medicare-eligible beneficiaries in Washoe, Storey, Douglas, Churchill, Lyon, and Carson City Counties in Nevada.

13.     Plaintiff Prominence HealthFirst of Texas, Inc. is a corporation organized under the laws of the state of Texas with its principal place of business in Reno, Nevada. Among other things, Prominence HealthFirst provides health insurance coverage under Medicare Part C, commonly known as Medicare Advantage, and prescription drug coverage under the Medicare voluntary prescription drug benefit, commonly known as Medicare Part D. Prominence offers its plans under contract number H7680 to more than 1,300 Medicare-eligible beneficiaries in Collin, Potter, Hidalgo, Deaf Smith, Randall, Brooks, Starr, Fannin, Grayson, Cooke, Gray, Moore and Webb Counties in Texas.

14.     Defendant Alex M. Azar II is sued in his official capacity as the Secretary of Health and Human Services.  This includes overseeing the operations of the federal Centers for Medicare & Medicaid Services ("CMS").  Secretary Azar, in his official capacity, is responsible

for implementing and complying with federal law, including the federal laws impacted by this action.

15.     Defendant Seema Verma is sued in her official capacity as Administrator of CMS, an operating division of the U.S. Department of Health and Human Services ("HHS").  As Administrator, Ms. Verma is responsible for the administration of the Medicare health program, including Medicare Advantage and Part D.  Administrator Verma, in her official capacity, is responsible for implementing and complying with federal law.

## FACTUAL ALLEGATIONS

### *The Medicare Program*

16.     The Medicare program, authorized under Title XVIII of the Social Security Act, is a federal program of health insurance benefits for Americans age 65 and older, and certain disabled persons and certain persons with kidney disease. CMS is the federal agency responsible for administering the Medicare program.

17.     Individuals entitled to and enrolled in Medicare may elect to receive their benefits through a Medicare Advantage plan under Part C of Medicare. Under Part C of Medicare, commonly referred to as the Medicare Advantage program, CMS enters into contracts with private insurance providers, known as Medicare Advantage Organizations. In exchange for a per-member, per-month payment, the private insurance providers agree to pay for the Medicare-covered benefits of those Medicare beneficiaries who enroll in that insurer's plan. Many Medicare Advantage Organizations provide their enrollees' prescription drug benefits under the Medicare Voluntary Prescription Drug Benefit Program, known as Part D.

18.     The insurer may also provide "supplemental benefits" above and beyond those covered by Medicare. Medicare Advantage Organizations can attract beneficiaries and better care for their health by providing extra health benefits, like dental or vision, medical transportation or over-the-counter drugs. Insurers can also lower the copayments and cost sharing that beneficiaries ordinarily pay in Medicare, reducing the cost of covered services.

19.     Medicare Advantage Organizations compete with one another to convince beneficiaries to select their plan. Each Organization structures its benefit offerings and premiums, and strives to offer high quality and customer service, to draw enrollees to its rolls.

20.      Medicare Advantage Organizations assume the financial risk of providing healthcare to enrollees that CMS would otherwise bear. CMS pays the Organization a per-member, per month premium, and shifts the risk of insuring these individuals from the federal government to the Medicare Advantage Organizations.

*CMS Assigns Medicare Advantage Contracts a Star Rating to Measure Quality*

21.     As regulator of the Medicare Advantage program, CMS assigns ratings each year to Medicare Advantage Organizations based on their scoring against certain measures of quality performance.

22.     CMS uses a scale of "stars" to signify performance, awarding up to five stars for the highest-performing Medicare Advantage Organizations on a contract by contract basis. Hence, the system is commonly referred to as the "Star Ratings."

23.     The Star Rating assigned by CMS is critically important to a Medicare Advantage Organization. As described below, a plan's Star Rating will have a direct impact upon the amount of payment that CMS makes to a Medicare Advantage Organization, directly influencing the premiums and benefits that the Organization is able to offer. The Star Rating can also

influence beneficiaries' choice to enroll in a Medicare Advantage Organization's plans, increasing or decreasing enrollment dramatically. And Organizations that consistently receive low ratings can face termination from the Medicare Advantage program.

*Star Ratings Have a Direct Impact Upon CMS Payments to Medicare Advantage Organizations*

24.     Through the Congressionally-mandated Quality Bonus Payment program, the Star Ratings assigned by CMS are a factor in determining CMS's payments to plans, and therefore the benefits that plans are able to offer to enrollees.

25.     In Section 1853(o) of the Social Security Act, Congress mandated that CMS vary its payments to Organizations using "a 5-star rating system (based on the data collected under [Section 1852(e) of the Social Security Act])" to allocate quality bonuses to Medicare Advantage Organizations.

26.     Under Section 1853(o), if a Medicare Advantage Organization's contract is rated at or above four stars, the plan will receive additional funds from CMS. These bonus payments can reduce or eliminate the premiums beneficiaries pay to enroll in the Organization's plans, or can provide Organizations additional protection against the risk of excess medical costs.

27.     By way of illustration, in 2021 CMS will pay Medicare Advantage Organizations up to $1,014.62 per-member per-month for enrollees in Broward County, Florida, before adjustments for that beneficiary's health characteristics. For Medicare Advantage Organizations eligible for the Quality Bonus Payment program, that amount can increase to $1,068.02, a difference of $640.80 per-member per year. In Miami-Dade County Florida, the maximum payment increases from $1,041.95 to $1,096.79 a difference of $658.08 per member, per year. These additional payments can increase further, once CMS adjusts its payments upward to account for a beneficiary's health conditions.

28.     Star Ratings can also impact plan payment by making more funds available to spend on supplemental benefits for enrollees. In accordance with Section 1854(b)(1)(C)(v) of the Social Security Act, when Medicare Advantage Organizations project expenses below a CMS-determined benchmark and agree to accept a lower payment from CMS, a portion of the savings is returned to the Organization for use in beneficiary supplemental benefits (a "rebate"). Through the Quality Bonus Payment program, the amount of rebate dollars paid will vary based on Star Rating: Plans at or above 4.5 stars retain 70 percent of the difference as rebate dollars; plans at 3.5 or 4 stars retain 65 percent; and Plans at or below 3 stars retain only 50 percent. A higher-rated plan will retain more rebate dollars and can therefore provide more supplemental benefits or lower premiums to its enrollees, without need of increasing its bid. Using its 2021 bid information to illustrate, a drop from 3.5 to 3 stars for Prominence HealthFirst would result in a reduction in rebate percentage from 65% to 50%.  This translates to a reduction of $38.84 per member, per month collected.  Based on potential membership estimates for 2022, this could lead to losses of $8.0 million or more.

*Star Ratings Influence Enrollment in Medicare Advantage Organizations*

29.     Medicare Advantage Organizations must recruit and retain enrollees through coordinated outreach and marketing efforts, designed to convince enrollees to pick their plan over competitors'. One of the ways that Medicare Advantage Organizations distinguish themselves is by touting their Star Ratings. The Star Ratings provide a convenient means for beneficiaries to identify plans that are of higher quality relative to other choices. Plans with higher Star Ratings are at a significant advantage in these efforts.

30.     Star Rating information is widely distributed to beneficiaries as they make their choice of plans, including by CMS itself. CMS facilitates the plan selection process by

maintaining a website known as the "Medicare Plan Finder." The Medicare Plan Finder is an interactive online tool that displays important information about available plans to assist beneficiaries in choosing the coverage that is right for them. CMS also publishes other authoritative online and print resources on available plans that beneficiaries rely upon to make their choices. CMS features Star Ratings prominently in all these materials, reflecting CMS's mandate to provide beneficiaries information to compare plan options under Section 1851(d)(4) of the Social Security Act. Moreover, CMS requires that Medicare Advantage Organizations provide Star Ratings information to beneficiaries through a standardized Star Ratings information document.

31.     CMS takes special effort to flag plans that it considers to be "low performing." If an Organization is assigned a Medicare Advantage or Part D summary rating of 2.5 or lower over three years of data, it is marked with a "low performing" icon on the Medicare Plan Finder. This icon is a bright red triangle with an exclamation point, similar to a caution sign, warning beneficiaries they may want to reconsider enrolling in that plan.

32.     The wide distribution of Star Ratings information increases the chances that beneficiaries will learn about and rely on Star Ratings and the low-performing icon in making plan choices.

*CMS May Terminate Medicare Advantage Organizations Due to Low Star Ratings*

33.     A Medicare Advantage Organization's Star Rating may determine whether it is permitted to participate in the program at all. CMS is permitted to terminate the contract of any Medicare Advantage Organization that Achieves a Star Rating lower than 3 stars for 3 consecutive contract years.

*CMS is Bound to Strict Procedural Limitations When Changing the Methodology Used to Determine Star Ratings*

34.     Reflecting the critical importance of the Star Ratings, and the need to allow organizations time to prepare for success, CMS must comply with specific procedural mandates imposed upon it by Congress, and CMS has traditionally followed even more stringent rules than required for notice and comment when changing the Star Ratings.

35.     In creating the Quality Bonus Payment program, Congress mandated that the 5-star rating program be "based on the data collected under" Section 1852(e) of the Social Security Act. In turn, Section 1852(e) prohibits CMS from collecting "data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration other than the types of data that were collected by the Secretary as of November 1, 2003." And the statute states that CMS "may only change the types of data that are required to be submitted under subparagraph (A) [of Section 1852(e)(3)] after submitting to Congress a report on the reasons for such changes that was prepared in consultation with MA organizations and private accrediting bodies."

36.     In addition, Section 1853(b) of the Act requires an advance notice and rate announcement to publicize and solicit comment on proposed changes to the Medicare Advantage payment methodology. CMS has consistently interpreted this mandate to cover the Star Ratings program because of the payment consequences of Star Ratings under section 1853(o) of the Act.

37.     Beyond these explicit mandates, CMS has taken care to promulgate rules and standards for the Star Ratings program in advance. As the agency observed when codifying the Star Ratings, "by adopting and codifying the rules that govern the Star Ratings system, we are demonstrating a commitment to transparency and predictability for the rules in the system so as

to foster investment." (83 Fed. Reg. 16440 at 16520 (April 16, 2008)) Historically, CMS has promulgated proposals for changes to the Star Ratings far in advance, even going so far as to solicit comment on significant changes to the Star Ratings using a Request for Comment process before releasing formal proposals for changes to Stars through notice-and-comment rulemaking. CMS has explicitly adopted a policy that substantive changes to the Star Ratings will not be implemented except through rulemaking after solicitation of public feedback. CMS codified this policy at 42 C.F.R. §§ 422.164 and 423.184.

<em>CMS Establishes the 2021 Star Ratings Program</em>

38.     On April 16, 2018, after public notice and opportunity for comment, CMS initially adopted a rule establishing the methodology for the calculation of the 2021 Star Ratings. CMS published this as a final rule at 83 Fed. Reg. 16440. In reliance on this publication, AvMed and Prominence invested their efforts in improving plan quality in the specific areas highlighted by CMS.

39.     The rule specified that CMS would collect data on plan performance throughout 2019 and early 2020, mostly measuring how a plan performed in 2019, and then compile that information into a final Star Rating.

40.     This process was to be similar to past years, with one notable change. For the first time in 2021, CMS would give additional weight to certain data from a survey of beneficiary satisfaction, scoring them with a weight of 2 times, relative to certain other measures, rather than 1.5 times the weight. This change reflected, in CMS's words "CMS's commitment to serve Medicare beneficiaries by including their assessments of the care received by plans."

41.     Around the same time, CMS adopted procedures for the measurement of Star Ratings when Medicare Advantage Organizations experienced disasters in their service areas,

first in sub-regulatory guidance and then codified a year later in regulation. In adopting these procedures, CMS recognized that disasters "may negatively affect the underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program, all without fault on the part of the [Organization] . . . ." (84 Fed. Reg. 15680, 15682 (April 16, 2019) (emphasis added). And since the Organizations were not at fault, the logical and fair thing to do was to adopt procedures in cases of disasters to "adjust the Star Ratings to take into account the effects of extreme and uncontrollable circumstances that occurred during the performance or measurement period in a manner that would generally hold the affected contract harmless from reductions in Star Ratings." Id. (emphasis added).

42.    One specific component of the CMS disaster policy related to the treatment of "improvement" measures in the Star Ratings. These measures track how an organization's performance on certain metrics changes over time. Under the CMS disaster policy adopted in 2019, the agency decided that it would not use "old" data in the calculation of improvement measures, if new data could not be collected: If a disaster impaired the collection or reporting of a measure, that measure would be excluded from "the applicable improvement measures for the current and next year's Star Ratings for the affected contract," and in no event would CMS substitute the prior year's improvement rating. (42 C.F.R. § 422.166(i)(7)).

*CMS Changes the 2021 Star Ratings Program in Response to COVID-19*

43.    On March 30, 2020 in response to the outbreak of the novel coronavirus ("COVID-19"), CMS announced (and on April 6, 2020 CMS published) an Interim Final Rule with comment period revising the data collection requirements and rating methodology for the 2021 Star Ratings previously set forth in 83 Fed. Reg. 16440. CMS published this "interim" rule at 85 Fed. Reg. 19230.

44.    In so doing, CMS committed two basic errors: The agency changed the types of data Medicare Advantage Organizations are required to submit to CMS without first conferring with stakeholders and submitting a report to Congress. And, having (unlawfully) eliminated half of the available data, CMS did not stop to consider how it could calculate the Star Ratings in a way consistent with its long-standing "hold harmless" principle, that would protect Organizations from ratings declines they could not control. Instead of upholding its basic promise to Medicare Advantage Organizations that disaster-affected Organizations would be held harmless against Star Rating decreases, it arbitrarily and capriciously concocted a hybrid rating system composed of a mix of old and new information, exposing Organizations to undeserved ratings declines.

_CMS Unlawfully Changed the Data that Organizations Must Report Without Notifying Congress_

45.    The first unlawful change in the Interim Final Rule was the suspension of data submission from two specific sources, the Healthcare Effectiveness Data and Information Set (HEDIS), and the Consumer Assessment of Healthcare Providers and Systems (CAHPS) survey, that Organizations had been scheduled to collect during the spring of 2020 for use in the 2021 Star Ratings.

46.    The Star Ratings are comprised in large part of data collected from components of two health plan-related data collection programs and surveys designed to measure plan quality. The largest of these is the Healthcare Effectiveness Data and Information Set (HEDIS), administered by the National Committee for Quality Assurance (NCQA), to measure the clinical quality performance of health plans. Much of the data underlying the HEDIS survey comes from health care claims processed by plans. Some is drawn from medical records collected by health plans from medical providers, either in person or, increasingly, automatically through

communication between plans and providers' electronic medical record systems. Other inputs for the Star Ratings are from the Agency for Healthcare Research and Quality's Consumer Assessment of Healthcare Providers and Systems (CAHPS) survey. CAHPS is a mail and telephone survey of Medicare beneficiaries designed to capture a consumer assessment of the quality of health services provided through their plan. Medicare Advantage Organizations do not carry out the surveys themselves, but are required to contract with CMS-approved third-party survey vendors who mail the surveys to beneficiaries and tally responses.

47.     In the interim final rule, CMS eliminated the requirement for all Medicare Advantage Organizations to submit HEDIS and CAHPS data to CMS.

48.     CMS said in the Interim Final Rule:

> In light of the public safety issues in continuing to require the submission of HEDIS data for the 2019 measurement year, we are eliminating the HEDIS 2020 submission requirement that covers the 2019 measurement year and we are requesting that Medicare health plans, including MA and section 1876 organizations, curtail HEDIS data collection work immediately.
>
>  . . .
>
> We are also amending the regulations requiring the submission of the CAHPS survey data to CMS for Medicare health and drug plans to relieve them of the requirement as it applies to the 2020 survey data collection to ensure the safety of survey vendor staff and align with the CDC's social distancing guidance.
>
> . . .
>
> Accordingly, we are modifying regulations in parts 417, 422, and 423 to eliminate requirements for the collection of HEDIS and CAHPS data that would otherwise occur in 2020.

49.     CMS stated that it was eliminating the HEDIS submission requirement to "allow health plans, providers, and physician offices to focus on caring for Medicare beneficiaries

during this PHE for the COVID19 pandemic and will minimize risk of the spread of infection by eliminating travel and in person work for the collection of HEDIS data." CMS justified the elimination of CAHPS surveys to "ensure the safety of survey vendor staff and align with the CDC's social distancing guidance."

50.     Regardless of the merits of this decision, when it suspended the collection of data in the spring of 2020, CMS changed the types of data Medicare Advantage Plans were required to submit for purposes of the Quality Bonus Payment program. But it is not within CMS's statutory authority to change by diktat the types of data that Medicare Advantage Plans are submitted for the Star Ratings.

51.     The Medicare Act contains a clear instruction that limits CMS's ability to change the data submitted for Quality Bonus Payment purposes. According to statute, CMS

> may only change the types of data that are required to be submitted . . . after submitting to Congress a report on the reasons for such changes that was prepared in consultation with MA organizations and private accrediting bodies.

Social Security Act Section 1852(e).

52.     By removing the HEDIS and CAHPS data submission, CMS made a significant change to the types of data that Medicare Advantage Organizations have submitted for years, and eliminated current health plan quality and beneficiary satisfaction information from the data submission altogether.

53.     Despite the statutory requirement to do so, CMS did not submit a report to Congress regarding change in the types of data to be submitted by Medicare Advantage Organizations for Star Rating purposes. Nor, upon information and belief, did CMS comply with the Congressional mandate to consult with Medicare Advantage Organizations and private accrediting bodies before modifying the data submission in order to prepare such a report.

54.     In failing to do so, CMS deprived stakeholders of advance warning of its intent to radically alter the Quality Bonus Payment program, and of the opportunity to address the impact of the COVID-19 pandemic on that program through rational and fair-minded methods. Indeed, just days before CMS released the Interim Final Rule, on March 27th, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. No. 116-136), a massive relief package addressing the pandemic. Had Congress been aware of CMS's pending actions, or the reasons for them, the legislature might have properly addressed the needs of beneficiaries, plans and CMS through legislation of its own. The required industry consultation and notice to Congress could also have resulted in CMS adopting an alternative methodology for calculating the 2021 Star Ratings that avoids the current method's capriciousness.

### The CMS Changes to the 2021 Star Ratings Were Arbitrary and Capricious

55.     Having cancelled the collection of data that made up nearly half of the 2021 Star Ratings, CMS was then left to decide how to calculate the 2021 Star Ratings without half of the information it would ordinarily use. In picking a method, CMS abandoned, without explanation, its freshly-made policy and promise to Medicare Advantage Organizations that it would hold them "harmless" from decreases in Star Ratings occasioned by disasters. Instead, it implemented a hodge-podge and non-sensical model that used old data in some places and new data in others, including in some cases data collected in the middle of the pandemic.

56.     Together, HEDIS and CAHPS measures comprise over 45% of the measures used to establish the 2021 Star Ratings. In the Interim Final Rule, CMS considered calculating the 2021 ratings using all available data other than CAHPS and HEDIS, but concluded that "we would not have enough measures to rate plans and to have a complete picture of performance given approximately half of the Star Ratings measures come from HEDIS and CAHPS."

57.     At this point, CMS should have considered how it could calculate the 2021 Star

Ratings while still honoring and remaining consistent with the principle and promise that

Medicare Advantage Organizations should be "held harmless" from declines in ratings that occur

due to disasters beyond their control.

58.     CMS never did this. Instead, CMS adopted revised Star Rating scoring methods,

replacing two fresh data sources (HEDIS and CAHPS) with the stale data from the previous

year's Star Ratings. CMS stated that:

> Given the issues related to PHE for the COVID-19 pandemic associated
> with completing the HEDIS data collection for the 2019 measurement
> year, we will use the HEDIS measure scores and Star Ratings based on the
> 2018 measurement year (that is, the data used for the 2020 Star Ratings)
> for the 2021 Star Ratings. For the 2021 Star Ratings, given the safety
> concerns related to completing the CAHPS surveys and data collection
> and the inability of survey vendors to fully complete data collection for
> 2020, we will use the CAHPS data submitted to CMS in June 2019.

59.     As to the remaining data points, CMS kept them in place, and determined that it

would rely on the data collected for 2021 as planned notwithstanding the COVID-19 pandemic.

According to CMS, "[t]he measurement period for all other measures will not change from what

was finalized in the April 2018 final rule."

60.     While CMS decided to use stale CAHPS and HEDIS data in the Interim Final

Rule, CMS paradoxically refused to adjust other measures currently impacted by the COVID-19

public health emergency. For the 2021 Star Ratings, two different measures, one each in Parts C

and D, were dependent on the results of an audit of a plan's call center performance: a CMS-

contracted auditor attempts to contact the plan and documents the number of successfully

completed contacts with an interpreter or TTY service. Despite cancelling the CAHPS survey to

ensure the safety of call center staff, CMS continued to audit Medicare Advantage and Part D

call centers during the same survey period, and is using that audit data as part of the 2021 Star

Ratings. Having determined that data collection in some areas could not proceed during a pandemic, CMS then proceeded to collect data and judge Medicare Advantage Organizations on their performance in this one area during that very crisis.

61.     This newly-adopted approach is wholly inconsistent with the principle that Medicare Advantage Organizations should be protected from ratings declines in a disaster. Despite its promise to hold Organizations harmless in disasters, Medicare Advantage Organizations are now at risk from declines not just in specific measures, but from *overall* ratings declines caused by the elimination of half of the Star Ratings program measures. The crucial point CMS failed to consider in the Interim Final Rule is that Organizations are exposed to declines in their 2021 non-HEDIS and non-CAHPS measures (based on new data) for which there is no adjustment, but simultaneously deprived of the chance to offset those declines with HEDIS and CAHPS improvements for 2021 over the previous year's results (based on old data).

62.     Unfair as it is, the arbitrary decision to rely on stale data to calculate nearly half of the 2021 Star Ratings also calls into question the basic validity of the overall Star Rating system: beneficiaries are now being informed that a plan is of a given rating for 2021, except that in fact that rating reflects the plan's performance several years ago in some respects, and performance during a pandemic in others. Instead of giving beneficiaries a "complete picture of performance," CMS has chosen to give beneficiaries two partial pictures of performance, blending multiple years of data into a single measure that signifies neither.

63.     CMS has made other decisions that call into question the validity of the 2021 Star Ratings. For example, although it has eliminated the use of current CAHPS data, it is still giving extra weight to the CAHPS scores calculated with old data and disproportionately increasing their influence on the Star Ratings, increasing their weighting from 1.5 to 2. Even though

Medicare Advantage organizations focused their attention on CAHPS ratings in 2019 to earn higher scores in this newly-emphasized area, CMS is instead disproportionately leaning on their 2018 performance to judge the plan's quality.

64.     Another quizzical step taken by CMS was to reverse its position on the calculation of the "improvement" scores during a disaster.  Ordinarily improvement scores compare year-to-year changes and reward plans for improving their performance year-over-year. CMS unequivocally stated in 2019 that improvement measures would not be calculated using "old" data during a disaster, and that "Contracts affected by extreme and uncontrollable circumstances do not have the option of reverting to the prior year's improvement rating." (42 C.F.R. §§ 422.166(i)(7), 422.186(i)(5)). Yet in the Interim Final Rule, without any explanation whatsoever, CMS decided that "Since we will be using the 2020 Star Ratings data for the HEDIS and CAHPS measures, we will carry forward the measure-level improvement change score . . . from the 2020 Star Ratings for all HEDIS or CAHPS measures for the 2021 Star Ratings Part C and D improvement measure calculations."  Further underscoring the capriciousness of CMS's approach, in the same Interim Final Rule, CMS adopted a completely different policy for the 2022 Star Ratings, deciding "We are revising the methodology for the Part C and D improvement measure for the 2022 Star Ratings to expand the hold harmless rule to include all contracts at the overall and summary rating levels."

65.     CMS also neglected in the Interim Final rule to contend with the effect that its approach would have on its assignment of a low-performing icon to plans rated 2.5 stars. CMS's regulations specify that the assignment of a low-performing icon is based on "3 years of data." (42 C.F.R. § 422.166(h)(1)(ii).) Yet having essentially eliminated a year's worth of data for some metrics, and only using 2 (or two-and-a-half) years' worth of data to assign Star Ratings, CMS is

still assigning low-performing icon status as if it was validly assessing plans over a three-year period.

66.    What CMS ultimately failed to recognize was that cancelling the data collection for HEDIS and CAHPS, which comprise a large portion of the 2021 Star Ratings, simply made any calculation of the Star Ratings impossible, at worst, or inaccurate, at best.

67.    Noticeably absent from the Interim Final Rule is any discussion of CMS's past policy of holding Medicare Advantage Organizations harmless. CMS never discussed or considered whether its new hybrid system could harm Medicare Advantage Organizations, now exposed to a system that could arbitrarily decrease its Star Ratings, and what measures could be taken to protect those Organizations and hold them harmless from year-over-year declines in their overall Star Ratings that were not their fault.

*The Interim Final Rule Harms AvMed and Prominence*

68.    AvMed and Prominence are high-quality plans. They have worked hard and invested significant capital to have their higher quality recognized through the 2021 Star Ratings. CMS told AvMed, Prominence and all other Medicare Advantage Organizations what the rules for those ratings would be. But the arbitrary changes to the 2021 Star Ratings adopted by CMS in its Interim Final Rule are an unlawful, last-minute switch that will impose significant harm on AvMed and Prominence. The application of this irrational system has lowered Plaintiffs' star ratings and will deprive them of needed Quality Bonus Payments in 2022.

69.    The net effect of CMS's changes to the 2021 Star Ratings is to reduce AvMed's overall rating from 4 stars (for 2020) to 3.5 stars (for 2021). By reducing AvMed's 2021 Star Rating, CMS has rendered AvMed ineligible for the quality bonus payment in 2022. AvMed anticipates this will reduce its revenue by $18 million for 2022.

70.    The net effect of CMS's changes to the 2021 Star Ratings is to reduce Prominence HealthFirst's overall rating from 3.5 stars (for 2020) to 3 stars (for 2021). By reducing Prominence HealthFirst's 2021 Star Rating, CMS has reduced the percentage of rebate dollars that Prominence expects to receive from CMS that it would otherwise use to provide supplemental benefits to its enrollees. Prominence anticipates this will reduce its revenue between $13-$20 million for 2022.

71.    The net effects of CMS's changes to the 2021 Star Ratings is to assign a 2.5 star rating to Prominence HealthFirst of Texas, Inc., where it would have received a 3-star rating had its investments in quality improvement been recognized in the 2021 Star Ratings using fresh data, and not using old improvement scores. As a result, Prominence HealthFirst of Texas has been labeled a "low performing" plan on the Medicare Plan Finder on the basis of incomplete data, discouraging beneficiaries from enrolling. It may also face termination of its CMS contract.

72.    Since CMS is failing to honor its promise to hold Medicare Advantage Organizations harmless in a disaster, each of the Plaintiffs are directly harmed by CMS's response to the current disaster and must each bear that rating for the entirety of the coming year.

73.    As a result, beneficiaries are now reviewing AvMed and Prominence's health plan options, and may view them as offering lower quality plans than their competitors, leading to fewer enrollments in AvMed and Prominence's plans.

74.    The elimination of eligibility for various Quality Bonus Payments may therefore result in AvMed and Prominence being required to either charge a Part C premium to enrollees, or offer them fewer benefits in 2022. Because their competitors are able to offer plans with lower premiums or extra benefits, AvMed and Prominence expect this could decimate their enrollment

and therefore their financial performance, which will likely affect the viability of its Medicare business going forward.

75.     Ultimately, the arbitrary nature of CMS's action is most clearly expressed in the impact analysis it performed when adopting the Interim Final Rule. There, CMS wrote:

> The modifications to the calculations for the 2021 and 2022 Part C and D Star Ratings to address the expected disruption to data collection and measure scores posed by the PHE for the COVID-19 pandemic should not have a significant impact on the distribution of ratings across Part C and D sponsors. Consequently, there should be negligible impacts on payments for MA organizations from these modifications.

Rather than calculate the actual potential impact of its changes to the 2021 Star Ratings, CMS assumed that the changes would not affect the distribution of ratings across all Medicare Advantage Organizations, and lead to negligible impact on payments. That unfounded assumption has proved woefully wrong in AvMed and Prominence's cases.

76.      AvMed and Prominence have been and will continue to be injured as a direct result of Defendants' actions.

77.     AvMed and Prominence respectfully request the relief as prayed for below.

**<u>First Claim for Relief</u>**
(Violation of Administrative Procedure Act -- Agency Action Not in Accordance With Law)

78.     Plaintiffs incorporate the foregoing paragraphs of this Complaint as if set forth fully herein.

79.     The Interim Final Rule amending the methodology for the 2021 Star Ratings violates the Medicare Act and the Administrative Procedure Act because it is not in accordance with the clearly expressed requirement of Congress that CMS not change the types of data collected to support quality bonus payment determinations without consulting with Medicare Advantage Organizations and accrediting organizations and issuing a report to Congress.

Accordingly, Defendants had no legal authority to suspend the collection of CAHPS and HEDIS data without so consulting and so reporting.

80.     Plaintiffs are adversely affected as a direct result of Defendants' actions.

81.     Plaintiffs therefore respectfully request the relief as prayed for below.

**<u>Second Claim for Relief</u>**
(Violation of the Administrative Procedure Act – Arbitrary and Capricious Agency Action)

82.     Plaintiffs incorporate the foregoing paragraphs of this Complaint as if set forth fully herein.

83.     Having suspended the collection of HEDIS and CAHPS data, CMS failed to implement a solution for the calculation of the 2021 Star Ratings in the absence of this data that would accurately reflect plan performance, and in contradiction to its prior promise to hold Medicare Advantage Organizations harmless against ratings declines in a disaster.

84.     Plaintiffs are adversely affected as a direct result of Defendants' actions.

85.     Plaintiffs therefore respectfully request the relief as prayed for below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs AvMed, Inc., Prominence HealthFirst and Prominence HealthFirst of Texas, Inc. pray for relief and judgment against Defendants as follows:

A.     entering judgment against Defendants and in favor of Plaintiffs for each count alleged in this Complaint;

B.     declaring that The Interim Final Rule's changes to the 2021 Star Ratings program violate the plain language of the Medicare Act, 42 U.S.C. § 1395 *et seq.*; exceed CMS's statutory authority, *see* 5 U.S.C. § 706(2)(C); are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, *id.* § 706(2)(A) and were adopted without observance of

procedure required by law, *id.* § 706(2)(D); and fail to follow the hold harmless policies that CMS has already adopted through a lawful rulemaking process as the appropriate response to disasters.

      C.      setting aside the Interim Final Rule's changes to the 2021 Star Ratings program; and

      D.      granting such other and further relief as the Court deems just and proper.

Dated:  November 20, 2020        Respectfully submitted,

**AVMED, INC.,**
**PROMINENCE HEALTHFIRST and**
**PROMINENCE HEALTHFIRST OF TEXAS,**
**INC.**

By:    /s/ Andrew Zimmitti
        Andrew Zimmitti
        Adam Finkelstein (application to D.D.C. pending)
        MANATT, PHELPS & PHILLIPS LLP
        1050 Connecticut Avenue NW, Suite 600
        Washington, DC 20036
        Telephone: (202) 585-6505
        Facsimile: (202) 637-1503
        azimmitti@manatt.com

        Charles E. Weir (*pro hac vice* pending)
        MANATT, PHELPS & PHILLIPS LLP
        2049 Century Park East, Suite 1700
        Los Angeles, CA 90067
        Telephone: (310) 312-4280
        Facsimile: (310) 312-4224
        cweir@manatt.com

        *Attorneys for Plaintiffs*
        *AvMed, Inc.,*
        *Prominence HealthFirst and*
        *Prominence HealthFirst of Texas, Inc.*